2016V01518/PWG/JW
CRAIG CARPENITO
UNITED STATES ATTORNEY
BY:  PETER W. GAETA
ASSISTANT UNITED STATES ATTORNEY
970 BROAD STREET, SUITE 700
NEWARK, NEW JERSEY 07102
TEL:  (973) 645-2927
FAX: (973) 297-2042
PETER.GAETA@USDOJ.GOV

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Hon.** |
| **v.** | : | **Civil Action No. 18-** |
| **APPROXIMATELY 400,000 AIRCRAFT PARTS,** | : | **VERIFIED COMPLAINT FOR FORFEITURE _IN REM_** |
| | : | |
| **Defendants _in rem_.** | | |

Plaintiff the United States of America, by its attorney, Craig Carpenito, United States Attorney for the District of New Jersey, for its verified complaint (the "Complaint") alleges, upon information and belief, as follows:

## I. NATURE OF THE ACTION

1.      This action is brought by the United States of America seeking the forfeiture of approximately 400,000 aircraft parts, which were seized on or about May 14, 2015 by U.S. Immigration and Customs Enforcement, Homeland Security Investigations ("ICE-HSI") from a storage facility in Cherry Hill, New Jersey (hereinafter referred to as the "defendants in rem" or the "defendant property").

2.     The defendant property is subject to seizure and forfeiture to the United States of America pursuant to 19 U.S.C. § 1595a(d), as merchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law, in that the defendant property is merchandise attempted to be exported and sent from the United States to Iran contrary to the provisions of the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, and their accompanying regulations, 31 C.F.R. Part 560.

## II.  JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355(a).

4.     Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the District of New Jersey, and pursuant to 28 U.S.C. § 1395(b), because the defendants in rem were seized in the District of New Jersey.

5.     The defendant property is in the custody of the United States Department of Homeland Security ("DHS") in a facility located in Middlesex County, New Jersey that contracts with DHS for such services.

### III.  <u>APPLICABLE FEDERAL STATUTES AND REGULATIONS</u>

**A.**  ***The International Emergency Economic Powers Act
and the Iranian Transactions Regulations***

6.      This civil forfeiture action arises out of violations of regulations and
Executive Orders issued pursuant to the International Emergency Economic
Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701, *et seq.*  This law, enacted in
1977, gives the President certain powers, defined in § 1702, to deal with any
threats with respect to which the President has declared a national emergency,
and prescribes criminal penalties for violations.  Section 1705 of Title 50,
United States Code, provides, in part, that "[i]t shall be unlawful for a person to
violate, attempt to violate, conspire to violate, or cause a violation of any
license, order, regulation, or prohibition issued under this title."  50 U.S.C.
§ 1705(a).

7.      Under the authority of IEEPA, the President and the executive
branch have issued orders and regulations governing and prohibiting certain
transactions with Iran by U.S. persons, or involving U.S.-origin goods.

8.      Beginning with Executive Order No. 12170, issued on November
14, 1979, the President has found that "the situation in Iran constitutes an
unusual and extraordinary threat to the national security, foreign policy and
economy of the United States" and declared "a national emergency to deal with
that threat."

9.      On October 29, 1987, President Ronald Reagan issued Executive
Order 12613 based upon his finding "that the Government of Iran is actively
supporting terrorism as an instrument of state policy," and also because of

Iran's "aggressive and unlawful military action against U.S.-flag vessels and merchant vessels of other non-belligerent nations." In the Executive Order, President Reagan imposed an import embargo "[t]o ensure that United States imports of Iranian goods and services will not contribute financial support to terrorism or to further aggressive actions against non-belligerent shipping." Section 1 of this Order provided that: "Except as otherwise provided in regulations issued pursuant to this Order, no goods or services of Iranian origin may be imported into the United States, including its territories and possessions, after the effective date of this Order." The United States Department of Treasury, Office of Foreign Assets Control ("OFAC") subsequently promulgated the Iranian Transactions Regulations (the "ITRs"), Title 31, United States Code of Federal Regulations, Part 560, to implement this import ban.

10. On May 6, 1995, President William Jefferson Clinton issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (together, the "Executive Orders"), and prohibiting, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated ITRs, codified at 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. The ITRs were later amended to reflect the

expanded prohibitions set out in Executive Orders 12957, 12959, and 13059, which were issued in 1995 and 1997 pursuant to IEEPA and other statutes.

11.    In 2012, the ITRs were renamed as the "Iranian Transactions and Sanctions Regulations" ("ITSRs").  The ITSRs generally prohibit any person from exporting or causing to be exported from the United States any goods or technology without having first obtained a validated export license from OFAC. The ITSRs imposed, among others, the following prohibitions:

i.    31 C.F.R. § 560.204 provides, in pertinent part:

[Unless licensed by OFAC] the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that (a) [s]uch goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or (b) [s]uch goods, technology, or services are intended  specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

ii.    31 C.F.R. § 560.203 states, in pertinent part:

Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or    avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

iii.   Part of the IEEPA, 50 U.S.C. § 1705, provides in pertinent part:

    (a)   Unlawful acts

        It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under [IEEPA].

**B.    *Forfeiture Authority***

12.    Title 19, United States Code, Section 1595a(d) provides in pertinent part that "[m]erchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law . . . shall be seized and forfeited to the United States."

## IV.  FACTS

13.    At all times relevant to this Complaint:

    a.   Lauritz Bertinus Wijers, a/k/a "Louis Wijers" ("Wijers"), was a resident and citizen of the Netherlands.  Wijers was the Managing Director of Wijers International Aviation Trading BV ("WIAT"), an international company that specialized in the acquisition and sale of aircraft parts, including aircraft parts from Fokker Technologies that were used in Fokker aircraft. WIAT was headquartered in the Netherlands, and the company maintained its main office and a warehouse in the Netherlands.

    b.   Fokker Technologies, headquartered in the Netherlands, was a company that designed, developed, and manufactured aircraft systems for use by aircraft manufacturers.

c.  Company One was a company headquartered in Pennsylvania engaged in the acquisition and sale of aircraft parts, among other things.

14.  Wijers owned a significant amount of Fokker aircraft parts or aircraft parts compatible with Fokker aircraft (the "Fokker aircraft parts"), valued in excess of $800,000.  Based on a consignment agreement entered into between WIAT and Company One in or about June 2014 (the "Consignment Agreement"), Wijers stored the Fokker aircraft parts in the United States. Under the terms of the Consignment Agreement, the parties agreed to split equally the net proceeds from the sale of the inventory.

15.  Because the Fokker aircraft parts were located in the United States pursuant to the Consignment Agreement, these parts were subject to United States export control laws, and Wijers first needed to obtain an export license from OFAC before exporting these items to Iran.

16.  The investigation revealed that Wijers attempted to export the Fokker aircraft parts to Iran, a prohibited country under the export laws of the United States, without first obtaining an export license from the United States Government.

17.  In furtherance of his scheme, Wijers intended to ship the Fokker aircraft parts from the United States, without the required export license, to the Netherlands.  Thereafter, he intended to ship the Fokker aircraft parts from the Netherlands to a trans-shipper in Turkey, and then ship the parts to Iran in exchange for approximately $800,000.

18.    In or about August 2014, Wijers engaged in a series of e-mails with an individual seeking to purchase Fokker aircraft parts (the "Potential Buyer") and have the parts shipped to a Middle Eastern country other than Iran.  On or about August 10, 2014, Wijers wrote to the Potential Buyer, "[s]ome countries are difficult to export parts to (IR) [Iran] but there are ways to ship the parts through alternative channels. . . ."  On or about August 12, 2014, Wijers received an email from the Potential Buyer, wherein he/she continued to seek to acquire Fokker aircraft parts and have them shipped to a Middle Eastern country other than Iran.

19.    Pursuant to a lawful search of Wijers' cell phone, iPad, and thumb drive, federal agents seized an email dated December 21, 2014 sent to Wijers from a company in Iran.  According to the email, the sender of the email was an "Iranian Aviation Support Company."  The subject line of the e-mail was "Enquiry spare parts & repair & overhaule [sic] & exchange MD-Fokker parts."  The email stated, in pertinent part, that the company would like to communicate with Wijers regarding the purchase of "MD-Fokker parts."

20.    Between March 31, 2015 and April 1, 2015, Wijers sent a series of emails to an individual associated with Company One.  Unbeknownst to Wijers, this individual (the "CW") was cooperating with law enforcement.  The emails included the following exchanges:

(a)    On or about March 31, 2015, Wijers sent an email to the CW with the subject line "additional parts."  In this email, Wijers stated, in relevant part, the "agreement is now that $400k will

be transferred after the components . . . are inspected in our warehouse and right before the components are transported to Kayseri/Turkey.  If the components arrive to the place of 'final' destination[1] and are physically checked . . . then the remainder will be transferred. . . ."

(b) In another email to the CW on or about March 31, 2015, Wijers stated, "Friday, I'm with the ambassador and I will hear how they are going to arrange payment.  But to pay in advance they will certainly not."

(c) On or about April 1, 2015, in an email from Wijers to the CW with the subject line "additional parts," Wijers stated, "I am at the embassy Friday and everything will be discussed further there.  Of course I will try so that we will be paid as soon as possible! . . . ."

(d) On or about April 1, 2015, the CW replied to Wijers, stating, in substance and in part:  "I will hear how it goes Friday, good luck with the men at the Iranian Embassy, regarding the handling of the order."

21. Also pursuant to the lawful search, federal agents found text messages received and sent by Wijers that revealed that Wijers was present at the Iranian Embassy in the Netherlands on or about April 3, 2015, which was a

---

[1]     Other information obtained in connection with the investigation indicates that the phrase "'final' destination" referred to Iran.

Friday.  On that date, Wijers sent a text message to the CW with a picture showing Wijers meeting with two Iranian officials.  Below this picture, Wijers wrote in a text message, in relevant part, "Yesss!  The flag can go out.  P.O. [purchase order] is in!!  For $800k paid and two installments.  There are however some conditions but that we can satisfy. . . ."

22.    On or about April 4, 2015, Wijers sent the CW an email that included an invoice dated April 7, 2015 (the "WIAT Invoice").  The WIAT Invoice appeared on WIAT letterhead, was addressed to a Turkish aviation company, and was signed by Wijers.  The second page of the invoice listed a series of Fokker aircraft parts.  The WIAT Invoice also contained information concerning the shipment of the items through Turkey and showed a sales price of $800,000 USD with "50% payment . . . due prior to loading the truck at our [WIAT] warehouse [in the Netherlands]" and "50% payment . . . due after complete inspection of the stock at the warehouse of [the Turkish aviation company]. . . ."

23.    On or about April 9, 2015, an Iranian official at the Iranian embassy sent an email to an individual of Iranian descent who operated a business in the Netherlands.  Wijers also received the email because his email address was on the "cc" line of the email header.  The email's subject line contained the same purchase order number that was referenced in the WIAT Invoice.  The April 9, 2015 email also revealed the following:

    a.   A Turkish aviation company would serve as the "central purchasing agent" and would act on behalf of various Iranian aviation companies to ensure that the Fokker aircraft parts were delivered to Iran.

    b.   The Iranian Embassy would facilitate the transaction and honor its commitment to the deal.

    c.   The Fokker aircraft parts could not be inspected in the United States "because the superintendents of the airlines with their military background [would] most likely [be] refused a travel permit."

24.    On April 20, 2015, Wijers entered the United States at Philadelphia International Airport in Philadelphia, Pennsylvania.  While seeking admission into the United States, Wijers was processed and questioned by officers from United States Customs and Border Protection ("CBP").  During this process, Wijers was asked about the countries with which he engages in business.  Wijers stated, among other things, that he does business with Australia, Germany, England, and the United States.  Wijers further stated that he had neither done any business in any Middle Eastern country nor spoken with or to anyone in those countries about doing business.  Furthermore, Wijers stated that his purpose in the United States was to collect aviation parts that Company One was supposed to sell for him.

25.    Later the same day, Wijers and the CW traveled to a restaurant in New Jersey.  At the restaurant, Wijers and the CW met with another individual,

who was represented to Wijers to be a businessman in the shipping business but in fact was an undercover law enforcement officer (the "UC").  During the course of this meeting, the following conversations, in relevant part, occurred:

a.   The UC provided Wijers with information concerning the UC's fee for a "normal" client, and advised Wijers that they would come to an arrangement where the UC's normal fees were "on paper."  The UC further stated, "[W]e have to come to some other terms, some other arrangement, for, or other fees which we have to charge extra, if you know what I mean."  Wijers responded affirmatively and did not object to the UC's suggestion.

b.   The UC stated the he would accept a down payment on the fee, "which is gonna be separate from what the legitimate looking shipment fees are . . . and then we're off to business."

c.   Wijers discussed the shipment route of the Fokker aircraft parts and stated that the parts would be shipped to Turkey by truck and "that's the end of the line for [him]."  The UC then responded, "They're responsible from Turkey to get it to where . . . ?"  Wijers interrupted the UC and stated, "Where ever, where ever, I don't want to . . . "  The UC then finished Wijers' sentence and stated, "We don't want to know."  Wijers replied, "I don't want to know."

d.   The UC asked if Wijers would be undervaluing the Fokker aircraft parts.  Wijers stated that his accountant had the Fokker aircraft parts listed at approximately €5,000[2] on Wijers' paperwork, but admitted that they were valued at least $500,000 when he imported them into the United States.[3]

e.   The UC advised Wijers that if he planned to export the Fokker aircraft parts out of the United States an export license was needed, but that he (the UC) would ship the Fokker aircraft parts for Wijers without the required export license in exchange for an additional $900 to $1,000 "extra cash" beyond the UC's regular fees.

26.   On or about April 21, 2015, Wijers met the CW and the UC at a warehouse in New Jersey for the purpose of discussing the export of the Fokker aircraft parts to the Netherlands.  During the course of this meeting, the UC explained that in order to export the Fokker aircraft parts, it was necessary to submit electronically a Shipper's Export Declaration (Department of Commerce Form 7225-V) ("SED").

27.   The SED requires the individual who completes and/or signs the form to certify that all information contained on the form is true and correct.

---

[2]   On April 20, 2015, €5,000 was equivalent to approximately $5,400 USD.

[3]   According to import records from CBP, the Fokker aircraft parts were valued at approximately $744,754 USD when they were imported into the United States on or about July 14, 2014.

The form advises that a false statement can subject the individual to civil and criminal penalties, including punishment under 18 U.S.C. § 1001.

28.     The UC provided Wijers with a paper copy of the form and reviewed it with Wijers.  Wijers wrote his company's name as the party in interest and the ultimate consignee.  When the UC suggested that one question on the form was "sensitive" because if the parts were going to Iran, the form would be false, Wijers responded, in sum and substance, "it's going to my store, that's all you know."

29.     Also during this meeting, Wijers gave the UC a document on WIAT letterhead titled "Pro Forma Invoice."  This document was signed by Wijers on behalf of WIAT, and represented that the Fokker aircraft parts would be shipped to the Netherlands.  The Pro Forma Invoice further represented that the merchandise subject to shipment was "Fokker Civil Aircraft Spare Parts" and "WIAT . . . Returned Consignment Stock."  According to the Pro Forma Invoice, the total book value of the merchandise was €5,000.[4]  Wijers also represented on the Pro Forma Invoice that the Fokker aircraft parts were being returned to the "WIAT warehouse because of re-sail [sic] purposes."

30.     Also on or about April 21, 2015, federal agents interviewed Wijers. After he was advised of his *Miranda* rights, Wijers stated the following, in pertinent part:

---

[4]     An appraisal conducted after the May 2015 seizure valued the Fokker aircraft parts at approximately $704,000 USD (liquidation value) and $1.4 million USD (retail value).

a.   that he traveled to the United States on or about April 20, 2015 for the purpose of "reclaim[ing] [his] stock" of Fokker aircraft parts;

b.   that he entered into a consignment agreement with Company One concerning his stock of the Fokker aircraft parts because he had financial difficulties, and that although he owned the Fokker aircraft parts under the agreement, Company One would sell the parts and bear the costs of the sale;

c.   that after the Fokker aircraft parts were shipped to the United States and in the possession of Company One, his financial difficulties continued, he lost all his savings, and was having difficulty paying his bills;

d.   that he had no buyers for the Fokker aircraft parts;

e.   that although he was in dire financial straits and was not paying any storage fees to Company One as required by the Consignment Agreement, he would now have to find a place to store the Fokker aircraft parts in the Netherlands; and

f.   that he would be responsible for the shipping costs to send the parts back to the Netherlands.

31.   In the interview, Wijers claimed to the agents that he concocted a plan over a period of several months to deceive the CW and Company One into believing that Wijers intended to sell the Fokker aircraft parts to Iran.  Wijers stated that if the CW believed Wijers' fictitious story, the CW would "take

distance off the stock." In sum, Wijers asserted that by falsely claiming he planned to sell the Fokker aircraft parts to Iran, Wijers could obtain his Fokker aircraft parts back from the CW (the representative of Company One).[5]

32.     Wijers further stated that because the UC believed that the Fokker aircraft parts would be shipped to Iran, Wijers paid the UC an "extra fee" of €500[6] to "make the paperwork." When federal agents confronted Wijers concerning this "extra fee," Wijers acknowledged that this payment was "not normal."

33.     Wijers also told federal agents that, in or about late March 2015, he visited the Iranian Embassy in The Hague and met with Iranian officials. When asked about the reason for his visit, Wijers stated, "It's a whole other story." Wijers then stated that he visited the Iranian Embassy to discuss tree technology (*i.e.*, trees that can survive in arid conditions without much water).

34.     Wijers further told federal agents that he acquired the Fokker aircraft parts in or about 2001 and said that the parts were "antiquated." Wijers estimated that since 2001 he had sold only about 10% of the stock of the Fokker aircraft parts and that he would be holding on to the old parts for a long time. Wijers conceded that Iran would be interested in purchasing the old parts because Iran maintained a fleet of older Fokker aircraft.

---

[5]     This claim was inconsistent with the Consignment Agreement, which permitted either party to withdraw unilaterally from the contract by giving three months' notice and paying the costs associated with transporting the inventory back to the Netherlands.

[6]     €500 was equal to approximately $538 USD on April 21, 2015.

## V.  **THE DEFENDANT PROPERTY**

35.    The defendant property consists of approximately 400,000 aircraft parts that were seized on or about May 14, 2015 by ICE-HSI at a storage facility in Cherry Hill, New Jersey.  The defendant property is currently in the custody of the United States.

## VI.  **CLAIM FOR FORFEITURE**

36.    The allegations contained in paragraphs 1 through 35 of this Complaint are incorporated herein and made part hereof.

37.    As a result of the foregoing, the defendants in rem are subject to seizure and forfeiture to the United States pursuant to 19 U.S.C. § 1595a(d), as merchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law, in that the defendants in rem constitute merchandise attempted to be exported and sent from the United States to Iran contrary to the provisions of IEEPA, 50 U.S.C. § 1705, the regulations set forth in 31 C.F.R. Part 560, and any other licenses, orders, regulations, and prohibitions issued pursuant to Chapter 35 of Title 50, United States Code.

WHEREFORE, the United States of America requests that the Clerk of the Court issue a warrant for the arrest and seizure of the defendants in rem pursuant to Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure, which the plaintiff will execute upon the defendants in rem pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c); that notice of this action be

given to all persons who reasonably appear to be potential claimants to the defendants in rem; that the defendants in rem be forfeited and condemned to the United States of America; that the plaintiff be awarded its costs and disbursements in this action; and that the Court grant such other and further relief it deems just and proper.

Dated:  Newark, New Jersey
         January 18, 2018

                                        CRAIG CARPENITO
                                        United States Attorney

                                        *s/ Peter W. Gaeta*            
                                        By: PETER W. GAETA
                                        Assistant United States Attorney

## **VERIFICATION**

STATE OF NEW JERSEY    )
COUNTY OF ESSEX       : ss.:
DISTRICT OF NEW JERSEY  )

    Luis D. Santana, being duly sworn, deposes and says that he is a

Special Agent with the U.S. Department of Homeland Security; that he has

read the foregoing Verified Complaint; and that the statements contained

therein are true to the best of his knowledge, information, and belief.

    The sources of deponent's information and the grounds of his belief

include official records and files of the United States, information obtained

directly by the deponent, and information obtained by other law enforcement

officials and representatives during an investigation of alleged violations of

Title 19, United States Code, Section 1595a(d); and Title 50, United States

Code, Section 1705 and the licenses, orders, regulations, and prohibitions

issued pursuant to Chapter 35 of Title 50, United States Code.

                                     Luis D. Santana, Special Agent
                                     U.S. Department of Homeland
                                     Security

Sworn to and subscribed before me
this 18 day of January, 2018
at Newark, New Jersey

Jaclyn N. Wyrwas
Attorney-at-Law of the State of New Jersey

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Peter W. Gaeta, Assistant U.S. Attorney - (973) 645-2927
United States Attorney's Office, 970 Broad St., Suite 700
Newark, New Jersey 07102

## DEFENDANTS

APPROXIMATELY 400,000 AIRCRAFT PARTS

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☒ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
19 U.S.C. § 1595a(d)
Brief description of cause:
civil forfeiture of aircraft parts

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
01/18/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Peter W. Gaeta

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

2016V01518/PWG/jw
CRAIG CARPENITO
UNITED STATES ATTORNEY
BY: PETER W. GAETA
ASSISTANT UNITED STATES ATTORNEY
970 BROAD STREET, SUITE 700
NEWARK, NEW JERSEY 07102
TEL: (973) 645-2927
FAX: (973) 297-2042
PETER.GAETA@USDOJ.GOV

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Honorable |
| Plaintiff, | : | |
| v. | : | Civil Action No. 18- |
| APPROXIMATELY 400,000 AIRCRAFT PARTS, | | WARRANT FOR ARREST *IN REM* |
| | : | |
| Defendant *in rem*. | | |

TO ANY OFFICER OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, HOMELAND SECURITY INVESTIGATIONS, AND/OR ANY OTHER DULY AUTHORIZED LAW ENFORCEMENT OFFICER:

WHEREAS, a Verified Complaint for Forfeiture *in Rem* has been filed on January 18, 2018, in the United States District Court for the District of New Jersey, alleging that the defendant property, namely approximately 400,000 aircraft parts is subject to seizure and forfeiture to the United States for the reasons set forth in the complaint; and

WHEREAS, the defendant property is currently in the possession, custody, or control of the United States; and

WHEREAS, in these circumstances Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions directs the Clerk of the Court to issue a Warrant for Arrest *in Rem* for the defendant property; and

WHEREAS, Rule G(3)(c)(i) of the Supplemental Rules provides that the Warrant for Arrest *in Rem* must be delivered to a person or organization authorized to execute it, who may be an agent with the United States Department of Homeland Security, or any other United States officer or employee, someone under contract with the United States, or someone specially appointed by the court for that purpose;

YOU ARE, THEREFORE, HEREBY COMMANDED to take such steps as are necessary to arrest and detain the defendant property, including, if appropriate, serving a copy of this warrant on the custodian in whose possession, custody, or control the property is currently found; and

YOU ARE FURTHER COMMANDED to use whatever means may be appropriate to protect and maintain the defendant in your custody until further order of this Court.

IN WITNESS WHEREOF, I, the Clerk of the United States District Court for the District of New Jersey, have caused the foregoing Warrant for Arrest *In Rem* to be issued pursuant to Rule G(3)(b)(i) of the Supplemental Rules.

Dated: _____

                                   _____
                                   Clerk of the Court

By: _____

                                   Deputy Clerk